**SUPERIOR MOTORS, INC., Plaintiff,**

v.

**WINNEBAGO INDUSTRIES, INC.,
Defendant.**

**Civ. A. No. 72–1257.**

United States District Court,
D. South Carolina,
Orangeburg Division.

June 5, 1973.

W. T. Klapman, Orangeburg, S. C., for plaintiff.

Donald V. Richardson, III, of Richardson & Plowden, Columbia, S. C., for defendant.

## ORDER

SIMONS, District Judge.

This matter is before the court upon defendant's Motion for Summary Judgment. There is also pending plaintiff's Motion for a Rule to Show Cause why defendant should not be held in contempt.

On August 18, 1971, Winnebago Industries, Inc., hereinafter "Winnebago," and Superior Motors, Inc., hereinafter "Superior," entered into a "Retail Sales and Service Agreement" whereby Superior became Winnebago's authorized retail dealer for the purchase, sale, and service of Winnebago products in the Orangeburg County, South Carolina, geographical area.[1] Provisions of that contract which are pertinent to this litigation follow:

"This agreement shall become effective on the date of execution and the term of this appointment shall continue through the model year ending August 31, 1972, or for the remainder of such model year from and after the date of execution of this agreement, and said term of this agreement shall automatically terminate at the expiration thereof, without notice, unless renewed by the parties by further mutual agreement in writing.

"Either party shall have the right to cancel this agreement without cause upon ninety (90) days written notice to the other.

"Termination of this Agreement cancels all unfilled orders for the Manufacturer's Products except orders for units which the Retail Dealer has sold bona fide to retail customers, but such termination shall not be deemed waived if Manufacturer there- after ships an order at the Retail Dealer's request to avoid imposing hardship on one of the Retail Dealer's customers. . . ."

Defendant filed with its Motion various "Dealer Contact Reports" compiled by Winnebago's district manager during the contract period with respect to Superior's performance as an outlet for Winnebago products. The reports reflect a growing disenchantment by Winnebago with Superior's conduct. Although the September 30, 1971, report concludes, "Dealer attitude good, he aggressive (sic)," there soon emerged a change in Winnebago's regard for its Orangeburg dealer: "If dealer does not come close to his model year projection, will recommend termination," report of January 19, 1972; "Dealer's performance in the next 5 months will determine the retention of his sales agreement," report of March 8, 1972; "Dealer continues to be marginal," report of April 5, 1972; "Dealer has not yet install (sic) Winnebago sign. I have been after him for about 10 months now to put up his sign. Each time he says he will do so immediately," report of June 29, 1972. Presumably as a result of such dissatisfaction, on July 31, 1972, Winnebago's general sales manager directed the following letter to Superior:

"Please take notice that we will not be renewing your Winnebago Sales Agreement for the 1973 Model Year.

"Your present agreement expires on the 31st day of August, 1972. As per the terms of your existing agreement, you will be entitled to and have all rights and privileges that are set forth in that agreement.

"If you have any questions relative to this matter, please contact your District Manager."

When the agreement was not renewed, Superior instituted this action by filing its Complaint in the Orangeburg County

[1]. The Complaint alleges that the August, 1971, agreement was a renewal of the original franchise agreement entered into between the parties on February 10, 1971.

A copy of the earlier contract has not been submitted to the court. However, it is the second contract about which this controversy revolves.

Court of Common Pleas on September 28, 1972. In essence, the Complaint alleged a wrongful termination of the franchise contract, in violation of a recently-enacted South Carolina franchise law, discussed below. The Complaint additionally alleged that plaintiff had ordered three Winnebago mobile homes from defendant on June 29, 1972, for August delivery, but that such vehicles were not delivered, in violation of the existing franchise agreement. The Complaint also asserted an amount due by defendant to plaintiff for warranty work and claims for damaged goods arising during the franchise operations.

One day following the institution of its action, plaintiff procured an *ex parte* restraining Order from the Honorable Louis Rosen, Resident Judge of the First Judicial Circuit. Citing the new legislation, Judge Rosen ordered that Winnebago "hereby is enjoined and restrained from failing to honor its franchise agreement with Superior Motors, Inc., until sixty (60) days have elapsed after the defendant has been able to establish due cause for the cancellation of the franchise, or until this case has been disposed of upon its merits." As counsel for Winnebago vigorously asserts, this injunction was obtained without the posting of any bond by Superior.

On the basis of diversity of citizenship of the parties, Winnebago removed the cause to this court on October 9, 1972, and thereafter timely filed its Answer. Subsequently Winnebago filed the instant Motion for Summary Judgment, contending that the franchise agreement had expired by its own terms on August 31, 1972, and thus there had been no wrongful cancellation.

Superior relies heavily on a recent enactment of the South Carolina Legislature entitled, "Regulation of Manufacturers, Distributors and Dealers," encoded at S.C.Code Ann. Sec. 46–150.151 et seq. (1972 Supp.). Although the title suggests a broader scope, the act purports to regulate only motor vehicle sales and business dealings. This legislation was approved on May 29, 1972, but provided that it would be effective as of January 1, 1972. Pertinent portions of the statute follow:

"Sec. 46–150.153. *Unfair methods of competition and unfair, etc., practices unlawful.*—(a) Unfair methods of competition and unfair or deceptive acts or practices as defined in Sec. 46–150.154 are hereby declared to be unlawful.

\* \* \* \* \* \*

"Sec. 46–150.154. *What acts deemed violations of Sec. 46–150.153; administrator and personnel; enforcement of chapter.*—(1) It shall be deemed a violation of paragraph (a) of Sec. 46–150.153 for any manufacturer, factory branch, factory representative, distributor, or wholesaler, distributor branch, distributor representative or motor vehicle dealer to engage in any action which is arbitrary, in bad faith, or unconscionable and which causes damage to any of the parties or to the public.

\* \* \* \* \* \*

(3) It shall be deemed a violation of paragraph (a) of Sec. 46–150.153 for a manufacturer, a distributor, a wholesaler, a distributor branch or division, a factory branch or division, or a wholesale branch or division, or officer, agent or other representative thereof: . . .

(c) To terminate or cancel the franchise or selling agreement of any such dealer without due cause. *The nonrenewal of a franchise or selling agreement, without due cause, shall constitute an unfair termination or cancellation, regardless of the terms or provisions of such franchise or selling agreement.* Such manufacturer, distributor, wholesaler, distributor branch or division, factory branch or division, or wholesale branch or division, or officer, agent or other representative thereof shall notify a motor vehicle dealer in writing of the termination or cancellation of the franchise or selling agreement of such dealer at

least sixty days before the effective date thereof, stating the specific grounds for such termination or cancellation; and such manufacturer, distributor, wholesaler, distributor branch or division, factory branch or division, or wholesale branch or division, or officer, agent or other representative thereof *shall notify a motor vehicle dealer in writing at least sixty days before the contractual term of his franchise or selling agreement expires that the same will not be renewed, stating the specific grounds for such nonrenewal in those cases where there is no intention to renew, and in no event shall the contractual term of any such franchise or selling agreement expire, without the written consent of the motor vehicle dealer involved, prior to the expiration of at least sixty days following such written notice.* During the sixty-day period, either party may in appropriate circumstances petition a court to modify such sixty-day stay or to extend it pending a final determination of such proceedings on the merits. The court shall have authority to grant preliminary and final injunctive relief." (Emphasis supplied).

Additionally, the legislation provides that "any person who shall be injured in his business or property by reason of anything forbidden in this chapter" may recover upon suit double his actual damages, plus costs and attorney's fee, and if the jury determines that the defendant acted maliciously, punitive damages in an amount equalling three times the actual damages may be awarded. Sec. 46-150.161.

## I. Constitutionality of the Statute As Applied to the Franchise Agreement of August 18, 1971

Winnebago asserted in its Answer that the new statute violates Article I, Section 4 of the South Carolina Constitution and Article I, Section 10 of the United States Constitution in that the statute attempts to impair vested contractual rights. Winnebago also assert-

ed that the statute did not afford due process of law as required by Article I, Section 13 of the state constitution and the Fourteenth Amendment to the federal constitution. This court is of the opinion that the contract clauses, principally relied upon by Winnebago's counsel in his argument upon the Motion for Summary Judgment, are dispositive of this case, and thus no consideration is given to the due process contention.

Both the federal and state constitutions prohibit the enactment of laws "impairing the obligation of contracts." The limited constitutional issue now facing this court is whether the statute in question, as applied to the contract entered into between these parties on August 18, 1971, does impair the obligations of that contract.

Generally it may be said that a legislative enactment impairs the obligation of a contract when it attempts to take from a party a right to which he is entitled by its terms. Thus legislation which attempts to make material alterations in the character, terms or legal effect of an existing contract impairs the obligations of that contract. Further, a statute imposing added conditions or duties on parties to a contract is void if it produces a change in the obligations or substantial rights of a party. 16A C.J. S. Constitutional Law § 353 et seq. (1956). The South Carolina Supreme Court has not hesitated to apply these principles strictly. In Federal Land Bank of Columbia v. Garrison, 185 S.C. 255, 193 S.E. 308 (1937), cert. denied, 302 U.S. 708, 58 S.Ct. 28, 82 L.Ed. 547 (1937), the court found deficient, as to mortgages existing when the act was passed, legislation enacted during the Depression intending to provide mortgagors with some protection against deficiency judgments. The court said that any deviation from the terms of a contract, such as by postponing or accelerating performance, imposing a condition not expressed in a contract, or dispensing with the performance of an expressed condition, was an impairing of the obligation of the contract, however

minute or apparently immaterial in effect. To the same effect is Henry v. Alexander, 186 S.C. 17, 194 S.E. 649 (1937), which teaches that a new statute cannot change the contractual rights and liabilities existing under prior statutory provisions.

Superior suggests that the franchise law was enacted by the state "in the interest of the public welfare and in the exercise of its police power," and it thus passes constitutional muster. It has been said that the mere fact that regulation of a corporation by a state under its police power may have the effect of impairing corporate contracts does not render such regulation unconstitutional. 16A C.J.S. Constitutional Law § 373. In Stone v. Salley, 244 S.C. 531, 137 S.E.2d 788 (1964), the state court again recognized that the right of citizens to make contracts is subject to the regulation and control by the state in the exercise of its police power. However, that case, which held that a statute empowering the State Dairy Commission to fix minimum retail milk prices was unconstitutional, is also authority for the proposition that the police power is concerned with the public, not private, welfare: "(G)overnmental intermeddling with business essentially private in nature is repugnant to the fundamental concept of free enterprise." Thus Stone v. Salley determined that the business of selling milk is not affected with the public interest, and that the regulation of retail milk prices is beyond the state's police power.[2]

■ This court thinks it unlikely that the motor vehicle franchising business would qualify as being affected with the public interest when the milk industry failed to do so, so that motor vehicle franchising agreements would come within the police power exception to the applicability of the contract clauses. However, whether the statute at hand so qualifies is an issue this court need not consider, and expressly refrains from so doing. For it may well be that this statutory scheme relating to motor vehicle franchises is valid as to contracts entered into subsequent to its passage, but invalid as to contracts existing at the time of its passage. See 16A C.J.S. Constitutional Law § 353. It is the retrospective application of this legislation, urged by the plaintiff, which is the concern of this decision.

■ In Pulliam v. Doe, 246 S.E. 106, 142 S.E.2d 861 (1965), the South Carolina Supreme Court considered the retroactivity of an amendment to the uninsured motorist provisions of the Motor Vehicle Safety Responsibility Act. The amendment denied recovery under the uninsured motorist provision against a motorist whose identity was unknown ("John Doe") unless there was physical contact between the insured's vehicle and that of the unknown motorist. No such statutory provision was in effect on June 2, 1963, when the plaintiff's policy of insurance became effective. The amendment was adopted by the legislature on June 14, 1963. Thus the issue for the court was whether the amendment applied retrospectively to an insurance contract entered into prior to the amendment's passage. The accident giving rise to the litigation, and of course the litigation itself, both occurred after the effective date of the amendment. Said the court:

"The fact that the loss occurred and the action was instituted after the effective date of the statute is not, however, conclusive of the issue here. Assuming that the amendment was remedial in character and intended to apply to a cause of action which arose

---

2. Stone v. Salley was followed in Richbourg's Shoppers Fair, Inc., v. Stone, 249 S.C. 278, 153 S.E.2d 895 (1967), which declared another statutory scheme for regulating milk prices unconstitutional. The court in *Richbourg* concluded: "Concern for the economic welfare of an industry cannot create in the legislature a power that is denied it by the Constitution." 153 S.E.2d at 899. Stone, Richbourg, and their predecessor, Gwynette v. Myers, 237 S.C. 17, 115 S.E.2d 673 (1960), were all 3–2 decisions.

after its enactment, . . . it could not operate to destroy vested rights or the obligation of contracts which had accrued prior to its adoption.

"While it is generally held that there is no vested right in any particular mode of procedure or remedy, 16 Am.Jur.(2d), Constitutional Law, Section 427, a statute which is only remedial in character cannot operate to disturb vested rights or impair the obligation of contracts protected by the contract provisions of the Constitution, Johnson v. Baldwin, supra, 214 S.C. 545, 53 S.E.2d 785. Therefore, the effect of the statute, even if remedial, upon the right of the plaintiff to maintain the present action must be determined by its operation upon the rights and obligations which had accrued to plaintiff under the contract of insurance previously issued." 142 S.E.2d at 863.

The court was somewhat concerned as to whether the amendment could be classed as "remedial" because of the general rule that remedial statutes which relate only to remedies or modes of procedure operate retrospectively, as opposed to other statutes which are construed as prospective only. But even remedial statutes are not given retrospective operation if to do so would impair contract obligations or disturb vested rights. 82 C.J.S. Statutes § 416 (1953). In holding that the amendment could not constitutionally apply to the insurance policy in question, the *Pulliam* court concluded:

"The amendment imposed a condition precedent to recovery (physical contact between the vehicle of the insured and that of the unknown motorist) which was not required before its passage and operated to restrict the coverage afforded the plaintiff under his policy. If permitted to operate retrospectively so as to bar the plaintiff from maintaining this action, the amendment would deprive the plaintiff of the right to enforce the coverage provided under his policy in violation of the provisions of the Constitution forbidding the enactment of any law impairing the obligation of a contract. Consequently, under any view of the matter, the statute here involved cannot operate to deprive the plaintiff of the right to maintain the present action." 142 S.E.2d at 864.

In the case at hand, the new legislation imposes several added conditions or duties upon the manufacturer; while taking from that party rights to which it was entitled in the contract. Under the contract, the franchise automatically terminated without any notice at the expiration of the term unless it was renewed in writing. Under the statute, the manufacturer cannot simply allow the agreement to expire, but must give sixty days' notice of his intention not to renew, together with a statement of his specific reasons for nonrenewal. Under the contract, either party had the right to cancel the agreement without any requirement of "cause", but simply upon ninety days' notice. Under the statute, the nonrenewal of a franchise without "due cause" is declared to be an "unfair termination," any provisions of the contract to the contrary notwithstanding. A manufacturer running afoul of the provisions of this legislation renders itself vulnerable to an award of double the plaintiff's actual damages, and treble punitive damages.

At the risk of being redundant, this court is not concerned with the wisdom or constitutional validity of this legislation as it may be applied prospectively. However, it is manifestly clear that this statute, if applied to the instant contract between the parties, would impose significant new duties and conditions and take away previously existing rights. As such, the legislation as applied to this contract would unconstitutionally impair its obligations. The rights of these parties then must be determined without reference to the new legislation.

■ It is not important that Winnebago's notice of intention not to renew and the termination itself occurred subsequent to the statute's enactment. This situation is analogous to *Pulliam, supra,* where the court held that the parties' rights must be determined as of the time of the contracting. Although the legislature expressed its intention that the statute be effective as of January 1, 1972, some six months prior to its enactment, even that retroactivity, if constitutional itself, does not reach the date of this contracting.

A case which lends much support to this court's decision is Globe Liquor Co. v. Four Roses Distillers Co., 281 A.2d 19 (Del.Supr.1971), cert. denied 404 U.S. 873, 92 S.Ct. 103, 30 L.Ed.2d 117 (1971), a case practically on all fours with the present controversy. In that action Four Roses sought to terminate the franchise it had granted to Globe to distribute Four Roses' products in Delaware. A Delaware Franchise Security Law sought to prevent such termination except under certain conditions. The franchise contract had been entered into on August 1, 1969, for a period of one year, and the contract provided that it would expire automatically on July 31, 1970. On June 29, 1970, Four Roses notified Globe that it did not intend to renew the franchise upon its expiration. On July 8, 1970, the Franchise Security Law became effective. When the contract expired on July 31, Globe brought suit, contending that the new law prohibited such unilateral termination. The Delaware law provided that a franchisor could not "unjustly terminate a franchise;" it provided that even with good cause a franchisor could not terminate or fail to renew without giving ninety days' notice to the distributor; and it provided for damages which, in the language of the court, "could be so substantial as to make it clear that they are savagely punitive." 281 A.2d at 21.

In analyzing the effect of the new legislation on the previously existing contract, the Delaware Supreme Court said:

"The effect of the Delaware Franchise Security Law is to transform the contract between Globe and Four Roses from one providing for a period of one year only with no right of renewal on the part of Globe to a contract to extend into the indefinite future which Four Roses may terminate only upon certain conditions and at its peril.

\* \* \* \* \* \*

"We think the Delaware Franchise Security Law accordingly makes a substantive change in the rights and obligations under this contract. These substantive changes are the imposition on Four Roses of the obligation to deal with Globe indefinitely, and the imposition of a penalty in the form of damages if it attempts to insist on its contractual rights. It is therefore not a minor change or infringement permissible under the exercise of the police power. It is therefore proscribed by the Contract Clause of the Federal Constitution." 281 A.2d at 21.[3]

## II. *Abstention*

■ Although the issue has been raised by neither party, the court feels compelled to consider whether it should abstain from passing judgment on the constitutionality of this statute because of a recent decision of the Fourth Circuit, AFA Distributing Co., Inc. v. Pearl Brewing Co., 470 F.2d 1210 (4th Cir. 1973). That case has many similarities with the instant action.

The *AFA* case again involved an attempt by a manufacturer (Pearl) to terminate a franchise agreement with its distributor (AFA). Under the contract Pearl was free to terminate the franchise without cause. This franchise

3. Although the court found the statute as it applied to that contract unconstitutional under the contract clause, it upheld the statute against constitutional attacks based on the due process and equal protection clauses of the federal and state constitutions.

originated on July 3, 1962; a Virginia law relating to the cancellation of winery and brewery franchises was enacted in 1964; in 1972, Pearl terminated AFA's franchise, apparently without notice to the distributor. The Fourth Circuit found the Virginia statute to be "exceedingly difficult and incredibly ambiguous." Nevertheless, the Virginia district court concluded that the legislature intended the statute to apply only to contracts *entered into* after January 1, 1964. Since the franchise at hand was entered into in 1962, the district court ruled that the new law did not apply, and it dismissed the action without discussing any constitutional questions. The Fourth Circuit felt that the statute could be better construed as applying to any franchise agreements *existing* on January 1, 1964, so that the legislative intent might have been for the statute to apply to the contract which was the subject of the litigation. Such an interpretation would have brought into question the constitutionality of the statute under the contract clause, and the appellate court speculated that the district judge's interpretation of the statute may have been "motivated by a wish to avoid a constitutional question." Said Judge Craven for the appellate panel, "Because of the ambiguity in the statute and because of an inchoate constitutional question, we think the district court should have applied the abstention doctrine." 470 F.2d at 1212. The court, citing numerous authorities on the abstention doctrine, distilled the law into the following statement:

> "We recognize that mere difficulty in determining state law does not in itself justify a federal court's declining to exercise its jurisdiction. Congress has adopted the policy of opening the federal courts to litigants in diversity cases, and we cannot close the door to the federal courts merely because such a case involves a difficult question of state law. Thus this judge-made doctrine of abstention may be applied only where there are

special circumstances." 470 F.2d at 1212–1213, citations omitted.

The court then enumerated several "special circumstances" justifying the invoking of abstention in that case. For the reasons discussed below, I do not feel that the same circumstances exist here.

First, the Fourth Circuit was concerned about the "incredibly ambiguous" nature of the Virginia statute, particularly as to what contracts the legislature intended the act to apply: "Should the state courts determine, as the court below held, that (the statute) applies only to contracts entered after the statute's effective date, no Contract Clause question would arise." 470 F.2d at 1213. The court also stated the general rule that a federal court will not anticipate a constitutional question. However, in the instant case, there is no issue of anticipation; the constitutionality of the South Carolina statute was squarely raised as an issue by Winnebago's answer to Superior's Complaint. Further, in this case there is no doubt that if the statute applies to this contract, as plaintiff urges, then it would have to apply to a contract entered into prior to its passage and its effective date. Such an application, for reasons detailed above, is unconstitutional. The Virginia statute in *AFA* could reasonably be construed to operate either prospectively or retroactively. But in the instant case, there is no doubt that the statute would have to operate retroactively if it is to be of any effect in this case.

The Fourth Circuit determined abstention was appropriate in *AFA* because "the state law is unclear" and because "a state court decision could conceivably avoid a constitutional decision." In the present case, the state statute is not so ambiguous; the legislature clearly expressed its intention as to when the statute should take effect. Further, no state court decision here could avoid the constitutional issue, for if the statute applies at all to this case, it applies retroactively and thus the constitutional issue is raised. The constitutional issue

is not "inchoate" here; it has been pleaded and argued from the outset.

Finally, the Fourth Circuit listed several "additional justifying factors" which made abstention appropriate in *AFA*. The absence of such factors here helps render that decision inapplicable. One such factor was that the corporate plaintiff in *AFA*, a citizen of Virginia, sought its relief in the federal district court in Virginia. But here the party invoking federal jurisdiction via removal was the defendant, a corporate citizen of Iowa. Another "special circumstance" cited in *AFA* was "the peculiarly exclusive dominion of the states over the control of distribution and sale of alcoholic beverages. Such control has been wholly preempted by the states." 470 F.2d at 1214. This court is aware of no corresponding "peculiarly exclusive dominion" over the motor vehicle industry by the states.

In sum, this court does not construe *AFA* as mandating abstention in such a case as the present, where the issue of a state statute's constitutionality is squarely presented to the court. The federal district courts of this state have not hesitated in the past to declare a state law unconstitutional, without waiting for an opinion of the state supreme court, when the issue was squarely raised. See, for example, Tention v. Southern Pacific Railroad Co., 336 F.Supp. 25 (D.S.C.1972), and McGee v. Holan Division of Ohio Brass Co., 337 F.Supp. 72 (D.S.C.1972), wherein courts of this district determined that this state's peculiar "long-arm" jurisdictional provisions relating to tort claims as inserted in the Uniform Commercial Code violated the state constitution's requirement that all acts are to relate to one subject which is to be expressed in the act's title.[4] The *AFA* decision does not convince this court that such practice was erroneous, and that abstention should have been invoked.[5]

## III. *Contempt*

■ Having determined that the plaintiff cannot constitutionally invoke the provisions of the 1972 legislation to the franchise contract at hand, it necessarily follows that Winnebago was within its contract rights in permitting the franchise to expire. This contract then expired under its own terms on August 31, 1972. Judge Rosen's Order of September 29, 1972, restrained Winnebago from failing to honor the contract. After this action had been commenced and removed to this court, Superior filed a Motion for a Rule to Show Cause why defendant should not be held in contempt for failing to obey Judge Rosen's Order. Specifically, Superior contended that Winnebago had violated the restraining Order by failing to ship the three units that Superior had ordered in June, 1972. By Reply Winnebago asserts that it has not violated the Order and that it has not failed to honor the franchise agreement, but since the agreement expired of its own terms at the end of August 1972, prior to the signing of the restraining Order, there is no agreement remaining to honor. Of course, whatever effect the state injunction may have had was not affected by removal to this court; the state order remains in full force and effect until dissolved or modified by this court. 28 U.S.C. Sec. 1450.

■ The restraining Order, issued as it was after the contract had expired, and obviously premised on the language of a statute which this court has found to be inapplicable to that contract, cannot have the effect of resurrecting the expired contract. The restraining Order, insofar as it attempted to perpetuate the franchise agreement beyond the

---

4. The reenactment of the "long-arm" provisions in 1972 under appropriate title erased the deficiency declared in *Tention* and *McGee*. See Segars v. Gomez, 360 F.Supp. 50 (D.S.C.1972).

5. In several cases contemporary with *AFA*, the Fourth Circuit has expressed a general distaste for abstention. See Wohl v. Keene, 476 F.2d 171 (4th Cir., 1973), and Connor v. Koons Ford Inc., 475 F.2d 1399 (4th Cir., 1973).

expired term, must now be regarded, in light of this court's decision as to the deficiency of the statute, as a void Order. The South Carolina Supreme Court has accepted as a "settled principle" that disobedience of a void Order is not contempt. State ex rel. McLeod v. Holcomb, 245 S.C. 63, 138 S.E.2d 707 (1964). Thus there is no merit to Superior's Motion for a Rule to Show Cause why Winnebago should not be held in contempt, and that Motion is denied.

Winnebago's Motion for Summary Judgment should be granted to the extent that this court has determined that S.C.Code Ann., Sec. 46–150.151 et seq. (1972 Supp.) do not apply to this controversy and that the contract expired of its own terms as of August 31, 1972. However, these determinations do not conclude the entire action.

■ Winnebago contends in its most recent brief that, as the contract provides for cancellation of all outstanding orders upon termination of the contract, Superior is not entitled to damages for Winnebago's failure to deliver the three units ordered by Superior in June. The court finds more appealing the reasoning submitted by Winnebago's counsel in his earlier brief: "If the contract lawfully terminated, the only issue remaining is whether or not Superior is entitled to delivery of three mobile homes and is entitled to warranty claims under the lawfully cancelled contract." Winnebago's July 31 letter informing Superior of its intention not to renew the franchise specifically stated, "Your present agreement expires on the 31st day of August, 1972. As per the terms of your existing agreement, you will be entitled to and have all rights and privileges that are set forth in that agreement." By Winnebago's own admission, the agreement did not terminate until August 31; thus the contract provision that "Termination of this Agreement cancels all unfilled orders for the Manufacturer's products" does not apply to the orders placed in June.

■ Although the contract expired as of August 31, there remain as genu-ine issues of material fact all allegations properly pleaded relating to performance under the contract prior to its expiration. Such matters are specifically raised in paragraphs VII and VIII of the Complaint, relating to the units ordered but not delivered, and asserting an amount owed to Superior for warranty work done for Winnebago and Superior's claim for damaged goods received from Winnebago. As to these allegations, summary judgment is inappropriate and these matters are reserved for trial on the merits. Federal Rules of Civil Procedure, Rule 56(d).

It is therefore Ordered:

(1) That defendant's Motion for Summary Judgment be partially granted, in that defendant is entitled to judgment as a matter of law that the franchise agreement between the parties expired as of August 31, 1972;

(2) That plaintiff's Motion for a Rule to Show Cause why defendant should not be held in contempt is denied; and

(3) That all issues properly raised by the pleadings as to the parties' performance under the franchise agreement prior to its expiration be set for trial at the next regular term of court for this division.

And it is so ordered.